IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF GIANI R. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF GIANI R. ET AL., CHILDREN UNDER
18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ASHLEY G., APPELLANT.


Filed August 13, 2019.    Nos. A-18-544 through A-18-546.


Appeals from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Affirmed.

Bernard J. Straetker, Scotts Bluff County Public Defender, for appellant.

No appearance for appellee.


RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

Ashley G. appeals the order of the county court for Scotts Bluff County, sitting as a juvenile court, which terminated her parental rights to her three children: Giani R. (case No. A-18-544), Marquiz B. (case No. A-18-545), and Joseph B. (case No. A-18-546). We granted Ashley's motion to consolidate these three appeals for disposition. The State did not file a brief in opposition to Ashley's appeal; however, based on our de novo review of the record, we affirm the order of the juvenile court.

- 1 -

BACKGROUND

Ashley is the biological mother of Giani (born 2009), Marquiz (born 2002), and Joseph (born 2004). Larry R. is the father of Giani and Marquiz, and Jamie V. is the father of Joseph. The parental rights of Larry and Jamie were terminated during these same juvenile proceedings below. Because Larry and Jamie are not part of this appeal, they will only be discussed as necessary.

In May 2016, the State filed a juvenile petition and a subsequent amended petition alleging that Giani was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015). Also in May, the juvenile court granted the State's motion for temporary custody of Giani, and he has remained out-of-home ever since; he was originally placed with Ashley's maternal aunt and was later placed with his maternal grandfather and the grandfather's wife. (At the time, Marquiz and Joseph were residing with a man purported to be their father, but who was later determined not to be either child's father after paternity testing was completed.) In June, Giani was adjudicated to be within the meaning of § 43-247(3)(a) based on Ashley's "no contest" plea to the allegations that she was unable to care for him due to incarceration and that her use of controlled substances placed him at risk of harm and/or deprived him of necessary care.

After a disposition hearing in September 2016, the juvenile court ordered Ashley to be drug tested "after court today." The court also directed the parties to comply with the terms of the Nebraska Department of Health and Human Services' (DHHS) case plan dated July 21, which was adopted by the court. That case plan stated that Ashley would: take a psychological and substance abuse assessment and follow all recommendations; participate in any program the jail offered in relation to her case; participate in Circle of Security; obtain and maintain safe and stable housing; and obtain and maintain legal means of income. After a review hearing in December, the juvenile court ordered Ashley to be drug tested "as soon as possible." The court also directed the parties to comply with the terms of the DHHS case plan dated December 2, which was adopted by the court; the terms were the same as in the July 21 plan set forth above.

Later in December 2016, the State filed separately docketed juvenile cases for Marquiz and Joseph. In its December juvenile petitions, the State alleged that Marquiz and Joseph were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Also in December, the juvenile court granted the State's motions for temporary custody of Marquiz and Joseph, and they have remained out-of-home ever since; they were placed with their maternal grandfather and the grandfather's wife. In January 2017, Marquiz and Joseph were adjudicated to be within the meaning of § 43-247(3)(a) based on Ashley's "no contest" plea to the allegations that the children lacked safe and stable housing, that she failed to provide for their basic needs including education, and that she was incarcerated and could not provide care.

After a February 2017 disposition hearing (Marquiz' and Joseph's cases) and review hearing (Giani's case), the juvenile court directed the parties to comply with the terms of the DHHS case plan dated February 8, which was adopted by the court. That case plan stated that Ashley would: take a psychological and substance abuse assessment and follow all recommendations; comply with random drug screening tests; while incarcerated, participate in any program the detention center offered in relation to her case; participate in Circle of Security; follow the conditions of her probation until she had satisfactorily completed the ordered term of probation;

obtain and maintain safe and stable housing; and obtain and maintain legal means of income. The case plans for Ashley, which were adopted by the court, remained the same after review hearings in May and August. Additionally, in August, the court ordered Ashley to continue counseling, communicate with DHHS, and do a parenting assessment. The court also ordered "the patch be continued for [Ashley] with additional methods of [drug] testing." The case plan for Ashley, which was adopted by the court, remained the same after a review hearing in November.

On November 30, 2017, the State filed motions to terminate Ashley's parental rights to all three children pursuant to Neb. Rev. Stat. § 43-292(2), (4), and (6) (Reissue 2016); § 43-292(7) was also alleged with respect to Giani only. The State alleged that: Ashley substantially and continuously or repeatedly neglected and refused to give the children, or a sibling, necessary care and protection; Ashley was unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct was seriously detrimental to the health, morals, or well-being of the children; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a); Giani had been in an out-of-home placement for 15 or more of the most recent 22 months; and termination was in the children's best interests.

TERMINATION HEARING

The hearing on the motions to terminate Ashley's parental rights was held on February 27, 2018. The State called several witnesses to testify, and numerous exhibits were also received into evidence. Ashley did not testify, nor did she call any witnesses to testify on her behalf. A summary of the relevant evidence follows.

After his removal from Ashley's custody, Giani was placed with Ashley's maternal aunt from May to October 2016. In October, Giani was placed with his maternal grandfather and his step-grandmother (Betty G.). In December, Marquiz and Joseph were also placed with their maternal grandfather and Betty; all three children remained in that placement at the time of the termination hearing.

Dr. Gage Stermensky II is a licensed psychologist. He conducted a psychological/parental capacity and substance abuse evaluation of Ashley over three dates in July and September 2016. His December report was received into evidence. Dr. Stermensky diagnosed Ashley with a dependent personality disorder, adjustment disorder with anxiety, borderline and antisocial traits, amphetamine-type substance use disorder (severe), and cannabis use disorder (severe). The report states, "The case and Ashley's ability to work on her current symptoms and maladaptive personality traits hinges on her ability to maintain sobriety." Dr. Stermensky had "significant reservations about Ashley's ability to sufficiently ensure the safety of her child[ren] at this time." "She will require extensive treatment and life restructuring prior to being able or ready to care for herself or her child[ren] in [a] manner that is safe and healthy." Dr. Stermensky recommended residential treatment services specializing in co-occurring disorders followed by a sober living house or half-way house; ongoing involvement in a 12-step or similar program and random drug testing; medication management; long term therapy; family therapy with her children (when determined to be safe by their healthcare professional); individual psychotherapy; and parenting education courses. At the termination hearing, Dr. Stermensky testified that "[b]ased on statistics,"

aftercare following residential treatment is important. It takes 12 months of sobriety to be considered "full sustained remission."

Breanna Bird is a children and family services specialist with DHHS. She was assigned to Giani's case at the end of July 2016, and she was also assigned to Marquiz and Joseph when they became state wards in December. Ashley had been arrested in May and was incarcerated (Bird thought it was related to a theft or burglary) when Bird got the case on July 28, but Ashley was released on July 29. Because the telephone numbers she had for Ashley were not working, Bird's first opportunity to have contact with Ashley was on September 9, when Ashley was sentenced in district court (given probation). After the September 20 dispositional hearing in the juvenile case, Ashley tested positive for amphetamine, methamphetamine, and THC. On September 27 she tested positive for THC. On September 29, as well as on October 3 and 5, Ashley admitted to using THC.

Bird testified that Ashley consistently visited the children until she was arrested in December 2016. Ashley was arrested on December 12 for driving under suspension, and she was released on December 14. Then on December 15, she was rearrested for probation violations, and she "had a trespassing charge . . . and a shoplifting charge. . . as well." Bird stated it "was concerning that it was a pattern," that "[w]hen the case started she was in jail, got out of jail, went back into jail." "And there were also instances of positive drug testing in the beginning of the case." According to Bird, DHHS was not able to provide any services to Ashley at the time she was incarcerated. Bird did talk with Ashley about what was going to happen when she was released. "There had been an [evaluation] that Dr. Stermensky had done. He had started it when Ashley was back in jail in the summer of 2016. And then it was finalized and his recommendations came out in December of 2016. So what he was recommending was inpatient treatment." Ashley was receptive to that recommendation. Ashley remained incarcerated in mid-March 2017 when the case was transferred from Bird to Morgan Weitzel.

Weitzel, a children and family services specialist with DHHS, was the ongoing case manager at the time of the termination hearing. She testified that when she was assigned to the case in mid-March 2017, Ashley had just been released from incarceration and was on house arrest; her sentence was completed on April 2. A few weeks later, Ashley went to residential treatment at St. Monica's in Lincoln, Nebraska. Dr. Stermensky acknowledged that St. Monica's would meet his recommendation for residential treatment specializing in co-occurring disorders. Weitzel stated that Ashley was successfully discharged from treatment on June 19, and returned to the area of Scottsbluff, Nebraska. For aftercare, Ashley was supposed to "step down" into the intensive outpatient program (IOP program), attend "NA/AA" meetings, and go to substance use counseling; however, Ashley did not follow through with the plan. Ashley attended a few sessions of IOP, but in late July/early August, she informed Weitzel that IOP conflicted with her work schedule. Ashley told Weitzel that she made alternative arrangements with her substance use counselor to do the IOP programming in one-on-one sessions. But when Weitzel spoke to the counselor in September, the counselor informed her that Ashley never scheduled the sessions.

Samantha Konopnicki, a family support worker with the McConaughy Discovery Center (Center), did supervised visitation and drug testing for Ashley, all of which occurred at the Center. Konopnicki worked with Ashley from November to mid-December 2016, when Ashley was arrested. After mid-December, Konopnicki did not have contact with Ashley again until the end of September 2017, when Ashley agreed to resume services.

We limit our discussion of Konopnicki's testimony regarding drug testing to what occurred after services resumed in the fall of 2017, as this would have been after Ashley completed inpatient treatment at St. Monica's. Konopnicki testified that drug testing was done through urinalysis (UAs) or "sweat patches" (the patches are usually worn for 7 to 10 days). In October, Konopnicki applied one patch on October 25--it came back positive for methamphetamine. In November, Konopnicki offered 5 UAs--Ashley completed one on November 2 which tested negative, but the other four were "no-shows." Also in November, Konopnicki applied patches on November 1, 15, and 24--all three came back positive for amphetamines and methamphetamines, and the one on November 1 also came back positive for marijuana. Even when her tests came back positive, Ashley denied using. In December, five UAs were offered, but they were all "no-shows." Also, on December 6, Konopnicki applied a patch, but it was never removed; Konopnicki had heard Ashley moved to Wyoming. Konopnicki applied two patches in January 2018, the one applied on January 24 came back positive for amphetamines and methamphetamines, and the one applied January 31 was not tested because Ashley did not comply with removal by February 14.

Konopnicki also testified about Ashley's visits. Ashley completed all visits from November 2016 until the time of her arrest in mid-December. After she agreed to resume services in the fall of 2017, Ashley completed five out of eight scheduled visits in October, and in November, she completed five out of nine visits; overall the visits were missed because there had not been a confirmation by Ashley or because Ashley was working, but there were "a couple times" Ashley stated she spoke to Marquiz and visits were canceled because he wanted to spend time with family members who were visiting from out of town; however, when Konopnicki spoke with Betty, Betty stated that Marquiz did not cancel visits. In December, Ashley completed one out of six visits (she apparently went to Wyoming that month). In January 2018, Ashley completed three out of five visits. In February, she completed one visit, which occurred 3 days before the termination hearing.

According to Konopnicki, during the majority of the visits, "the boys really like[d] interacting with each other, wrestling, giving each other a hard time," and "Ashley engage[d] with them." Konopnicki had no safety concerns during visits. "The consistency is a concern." The boys "get very worried when they think she's not going to show up, if she's a little bit late, especially Giani."

Betty (the boys' step-grandmother) testified that since December 2016, Ashley's visits with the boys have decreased. When asked what she saw the boys needing in order to have a good day or a good week, Betty responded, "To know that they can count on a visit with their mom." She agreed that meant stability and a routine. When asked if she had seen the boys get that of late, she responded, "Not as much." The boys have phone access and access to social media and there is "usually daily" contact between Ashley and the boys that way, "mostly texts."

As far as housing, Konopnicki testified that Ashley "recently" obtained a trailer; Konopnicki agreed that prior to this, Ashley gave the impression that she had been "couch surfing." And Weitzel testified that she had not known where Ashley was staying since August 2017 when Ashley said she was going to stay with a relative in Gering, Nebraska; Weitzel got the impression from Betty that Ashley's living situation with her relative did not last more than a few weeks. Weitzel was not aware that Ashley had obtained a trailer as testified to by Konopnicki.

As far as employment, Weitzel stated that Ashley reported working at a gas station from late June or early July 2017. Weitzel said that her supervisor was able to confirm with the gas station that Ashley was not working there in November; "they didn't confirm whether she ever had worked there," "[b]ut she was not when we checked" in November. Ashley also reported working at the chicory plant, but Weitzel had not confirmed that by the time Ashley reported being laid off "a couple of weeks" later. Ashley had not made Weitzel aware of any other employment since November 21.

Weitzel's biggest concern at the time of the termination hearing was "how far things have regressed." When Ashley got out of treatment in June 2017, she was compliant with drug testing and making visits. But "things have just really gone downhill." Visitation had to decrease because the visits were getting canceled or missed. Ashley was no longer compliant with her patches and had not complied with UAs. Weitzel still did not know anything about Ashley's employment or housing. According to Weitzel, there had been "just a huge lack of engagement and lack of progress," and it was DHHS' stance that termination was in the best interest of all three children.

Dr. Stermensky testified, "I was very happy to see that [Ashley] had attended St. Monica's, enrolled in IOP. It sounds like there may have been some relapses after that as well as some noncompliance and failure to show up . . . for the drug testing and the visitation for a period of time." When asked why all of that was concerning, Dr. Stermensky responded, "A lack of treatment engagement and follow-through." Dr. Stermensky stated, "I'd say the worst indicator for the possibility of success was the failure to comply towards the end." "[W]hen they start avoiding it and disengaging from their system, from that system unfortunately, we see a lot more reversals, and it's much more difficult to get involved within those systems again."

JUVENILE COURT'S DECISION

In an order filed on May 3, 2018, in each of the three juvenile court cases, the juvenile court terminated Ashley's parental rights to Giani, Marquiz, and Joseph after finding that statutory grounds for termination existed pursuant to § 43-292(2), (4), and (6) with respect to all three children, as well as § 43-292(7) with respect to Giani only, and that termination of Ashley's parental rights was in the children's best interests.

Ashley appeals the juvenile court's order.

ASSIGNMENT OF ERROR

Ashley assigns that the juvenile court erred in finding that termination of her parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

Although Ashley does not challenge the statutory grounds for terminating her parental rights, for the sake of completeness on our de novo review, we briefly address the statutory grounds.

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Ashley's parental rights to Giani, Marquiz, and Joseph, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect), § 43-292(4) (parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by court to be seriously detrimental to health, morals, or well-being of juvenile), and § 43-292(6) (having determined children were juveniles as described in § 43-247(3)(a), reasonable efforts to preserve and reunify family had failed to correct conditions leading to determination); and additionally as to Giani only, § 43-292(7) (child out-of-home for 15 or more months of most recent 22 months).

Section 43-292(2) generally provides for termination of parental rights when the parent has neglected and refused to give the necessary care to the juvenile or a sibling of the juvenile. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). "One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2)." *In re Interest of Joseph S. et al.*, 291 Neb. 953, 961, 870 N.W.2d 141, 148 (2015). "A parent may as surely neglect a child of whom she [or he] does not have possession by failing to put herself [or himself] in a position to acquire possession as by not properly caring for a child of whom she [or he] does have possession." *In re Interest of J.N.V.*, 224 Neb. 108, 112, 395 N.W.2d 758, 761 (1986).

When these juvenile cases were filed in May and December 2016, Ashley was incarcerated and therefore was unable to provide care for her children, and her admission to such was one of the reasons all three children were adjudicated under § 43-247(3)(a). Additionally, in Marquiz and Joseph's cases, they were adjudicated under § 43-247(3)(a) based on Ashley's admission that they lacked safe and stable housing and that she failed to provide for their basic needs including education. The record reflects that Ashley's attendance at visitation has decreased and that she continues to test positive for drugs, has failed to maintain housing, or provide proof of employment. By refusing to make consistent progress in services, Ashley failed to put herself in a position to acquire possession of the children. See *In re Interest of J.N.V., supra*. Our de novo review of the record clearly and convincingly shows that grounds for termination of Ashley's parental rights under § 43-292(2) were proven by sufficient evidence.

We need not consider whether termination of Ashley's parental rights was proper pursuant to § 43-292(4) or (6), or (7) as to Giani only, since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that

termination is in the best interests of the children. See *In re Interest of Elizabeth S., supra*. Thus, the next inquiry is whether termination is in the children's best interests.

## BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

At the time of the termination hearing, Giani had been in an out-of-home placement for 21 months, and Marquiz and Joseph had been in an out-of-home placement for 14 months. During the pendency of this case, Ashley regressed. After attending treatment at St. Monica's from April to June 2017, Ashley failed to follow through with her IOP. When Ashley resumed services with Konopnicki in October 2017, and up until the time of the termination hearing in February 2018, she repeatedly tested positive for methamphetamines and amphetamines, and often was not compliant in drug testing. Additionally, she was not consistently attending visits. The testimony suggests that she may have recently obtained a trailer home, but prior to that she had apparently been "couch surfing." And she never maintained stable employment. Weitzel testified that there had been "just a huge lack of engagement and lack of progress," and it was DHHS' stance that termination was in the best interests of all three children. We agree. The children deserve permanency and a safe and stable home. Ashley's noncompliance has served as a barrier to reunification. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness as to Ashley. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Ashley's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Ashley's parental rights to Giani, Marquiz, and Joseph.

AFFIRMED.